## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————

ATLANTIC POWER & ELECTRIC
COMPANY,

              Plaintiff,

     v.

THE BIG JAKE and SAFER TUG &
BARGE, LLC,

          Defendants.

———————————————————

Civil No. 20-7585 (NLH/MJS)

**OPINION**

**APPEARANCES:**

MARY REEVES
BRIAN MCEWING
REEVES MCEWING, LLP
1004 S. FRONT STREET
PHILADELPHIA, PA 19147

     *Attorneys for Plaintiff Atlantic Power & Electric Company*

JOSEPH J. PERRONE
MATTHEW M. GORDON
GUILIANO MCDONELL & PERRONE, LLP
139 PROSPECT STREET - 2ND FLOOR
RIDGEWOORD, NJ 07450

     *Attorney for Defendants the Big Jake and Safer Tug & Barge, LLC*

**HILLMAN**, **District Judge**

     This matter comes before the Court by way of a motion for

summary judgment, [Docket Number 49], filed by Plaintiff,

Atlantic Power & Electric Company ("Atlantic Power"), pursuant to Federal Rule of Civil Procedure 56.  The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court grants in part and denies in part Plaintiff's motion for summary judgment.

<u>**BACKGROUND**</u>

The Court takes its facts from the record and the parties' statements of material facts not in dispute.  The Court will note disputes where relevant.

Atlantic Power is a Pennsylvania corporation that, in addition to general electrical contracting work, performs repairs to vessels, provides electrical supplies and equipment, and other services.  Atlantic Power's principal place of business is in New Jersey.  Douglas Galka, a licensed electrician, is Plaintiff's principal and president.

Defendant Safer Tug & Barge, LLC ("Safer Tug") is a Delaware limited liability company and the owner of the Defendant vessel the Big Jake (the "vessel").  Safer Tug's principal place of business is in New Jersey.  Edward Safer, Jr. is Safer Tug's principal.  According to Safer, prior to the instant action, Safer and Galka were close friends for over 20 years until a falling out.

2

Safer Tug purchased the vessel in December of 2014. According to Safer, the vessel needed work to become seaworthy, to which he contacted multiple friends, including Galka, to help him work on the vessel.

On or around February 2015, Galka claims he corresponded with Safer via text messaging to offer to provide services for electrical installation and rewiring of the vessel.  Exhibit I, [Dkt. No. 49-11].  In exchange for said services, Plaintiff avers that Galka requested terms of: (1) "[$]1,000.00 per 10 hour day," (2) with any time over per day as free, and (3) "all expenses paid" (including "travel, food, tolls, lodging, [] etc." and materials, for which he agreed to "submit invoices to [Safer] as they come in").  *Id.*  The alleged text message further sets forth that Galka's hours billed "will be logged and agreed on by both parties."  *Id.*  Plaintiff asserts that Safer responded to the message with a reply text message of "Sounds good.  !!  Lets go[.]  I m in van with darrin and Donna. Smoking like crazy[.]"  *Id.*

Defendants deny this account and dispute the authenticity of the text messages.  Although Defendants' discovery responses note they can neither admit nor deny the authenticity of the purported text messages, Safer declares that he lacks any independent recollection of the messages and has no copies of

said messages on his phone.[1]  Declaration of Edward Safer, Jr.,
[Dkt. No. 57-2], ¶8.  Defendants note the messages are not
dated, or at least not clearly dated, and the text messages'
content is irreconcilable with Safer's sworn declaration.  For
example, Safer declares, "I did not have a van, I have no
recollection of Darrin or Donna, and I never smoked in my life."
Safer Decl., ¶8.

From approximately February 2015 through November 2016,
Galka worked on the vessel.  According to Safer, most of the
work performed on the vessel occurred in New York while it was
at boatyards in Brooklyn and Staten Island.  During this time,
Galka claims his invoices grew to reflect $130,910.34 worth of
services (e.g. labor, materials, fuel, tolls, interest).
Exhibit C, [Dkt. No. 49-5].

On September 5, 2016, Safer signed and dated a Tugboat
Invoice Summary totaling $125,215.34.  Exhibit D, [Dkt. No. 49-
6].  Just above the Invoice Summary's signature and date lines
is the typed-out phrase: "Confirmation that I have received and
accepted the attached billing."  *Id.*  Galka claims that, despite
repeated demands, Safer refused to pay the outstanding balance,
which resulted in Atlantic Power filing a Notice of Claim of
Lien against the vessel in May of 2018.

---

[1] Safer declares that the phone he used at that time is no longer
in his possession.

In contrast to Galka's version of events, Safer claims he had no idea that he was engaging Galka's business to provide services to Safer Tug.  Safer declares he merely called upon an old friend to help lend his electrical contracting skills in an exchange, as was their custom for decades.  Safer declares that, prior to their falling out, Galka and Safer worked with and for one another for over 20 years trading services as friends. Safer claims they never once exchanged bills or payments beyond the reimbursement of expenses.  Safer thus claims he never expected Galka to bill Safer Tug for anything beyond expenses.

Safer denies entering into an agreement with Plaintiff on behalf of Defendants.  According to Safer, he and Galka agreed to a simple exchange.  In return for Galka's services, Safer Tug would reimburse Galka's expenses and assist him in acquiring a maritime 200-ton towing license -- which Galka needed to become a member of the International Longshoremen's Association and thereby earn union scale wages and benefits for future union work.  In fact, this arrangement was not unique, as Safer claims he called upon another friend, Gregory Szabo, a licensed heating and plumbing contractor, under an identical agreement.

In support of Defendants' version of events, Defendants put forth Szabo's declaration.  Szabo declares:

> We all worked on the Vessel with the
> understanding that we were donating our time
> and that, once completed, the BIG JAKE would

> give us the opportunity to earn money by
> becoming licensed tugboat mariners and
> employable as union seafarers.  I
> specifically recall Mr. Galka and I talking
> about how we could earn good money with
> union work once the BIG JAKE was in service.
>
> [Declaration of Gregory Szabo, [Dkt. No. 57-
> 3], ¶4.]

Szabo further states that Safer Tug "paid for the classes and
training, flew an instructor to New York to teach the classes,
and paid all associated charges for all of us to earn our 200—
ton licenses." *Ibid.*  Szabo claims, throughout the course of
their many interactions, Galka never mentioned that he expected
to be paid, that Galka had a contract, or that Galka expected
anything beyond reimbursement for expenses and the opportunity
to earn a maritime license.  *Id.* at ¶¶3-5.

Defendants also take issue with the Tugboat Invoice
Summary.  Defendants claim they neither confirmed nor accepted
the invoice's balance.  Under Plaintiff's version of events,
pursuant to the text message agreement, Plaintiff was
responsible for billing Safer Tug periodically, logging hours,
and having said hours agreed to by both parties.  Defendants
aver that Plaintiff failed to do any of these administrative
obligations and have not produced anything to the contrary.
Safer further declares he signed the invoice "because my friend
asked me to, not because I thought we had a formal contract or
my company owed his company money for labor.  He told me that he

needed the papers to account for his time to his girlfriend who was also his bookkeeper." Safer Dec., ¶9. Safer claims he had multiple in-person and telephone calls with Galka disputing the validity and contents of the invoice. Furthermore, Defendants argue the invoices are unreliable, containing numerous errors and dubious entries:

- Safer's signature is dated September 5, 2016, yet the invoice itself is dated July 21, 2017. Moreover, the invoice contains time entries for work performed in October and November 2016 — making them irreconcilable with the signature date.

- The invoice includes charges that are irrelevant to the vessel, such as charges for work performed on Safer's daughter's restaurant and Don Lane's home.

- Charges for work performed on the vessel corresponding to days when no one worked on the vessel.

- Charges for travel, events, work at peoples' homes, and to attend events that had nothing to do with work on the vessel.

Accordingly, Defendants dispute the validity of the invoices and deny owing anything further to Galka, claiming he was reimbursed for all expenses as per their agreement.

On June 22, 2020,[2] Plaintiff filed this matter before the Court.  Plaintiff named Safer Tug, *in personam*, and the vessel, *in rem*, as Defendants.  Plaintiff's Complaint has four counts, including claims for breach of contract, unjust enrichment, quantum meruit, and a maritime lien under the Commercial Instruments and Maritime Lien Act ("CIMLA," previously called the Federal Maritime Lien Act or "FMLA"), 46 U.S.C. § 31301 *et seq*.

On March 22, 2021, Plaintiff filed the instant motion for Summary Judgment.  Defendants filed their opposition on April 19, 2021, and Plaintiff filed a reply on April 26, 2021.  Plaintiff's Motion for Summary Judgment is therefore ripe for adjudication.[3]

---

[2] The vessel was arrested that same day.

[3] Plaintiff moved for an Order of Sale of the Vessel on October 23, 2020, [Dkt. No. 30], and the Court granted same on March 10, 2021, directing the Marshall of the United States District Court (the "Marshall") to hold a public auction of the Vessel.  See Order granting Motion for Sale, [Dkt. No. 47].  On June 23, 2021, the Marshall held an auction with a preset minimum bid of $50,000.00; however, the Vessel failed to sell.  July 12, 2021 Order, [Dkt. No. 67].  The Court again ordered that the Vessel be sold at public auction, this time establishing a minimum bid of $40,000.00.  *Id.*  On August 26, 2021, the Vessel was sold at auction for the minimum bid.  Certification of Mary E. Reeves, [Dkt. No. 73-1], ¶2.  On September 3, 2021, the Court issued an order confirming the sale of the vessel pursuant to Local Admiralty Rule E(12)(f).  Order Confirming Sale, [Dkt. No. 75].  The Court ordered the Marshall to provide the bill of sale and any other documents needed to transfer title to the successful bidder, TB Equipment LLC, on October 21, 2021.  See Order, [Dkt. No. 79].

**ANALYSIS**

**A.   Jurisdiction**

This Court's authority over admiralty cases derives from the Constitution, which provides federal judicial power "to all Cases of admiralty and maritime Jurisdiction."  U.S. Const. art. III, § 2.  Congress, in turn, encapsulated this power in statute giving federal district courts "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1).  Here, jurisdiction derives from both statute, specifically CIMLA and U.S. admiralty common law. *E.g., Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 305 F.3d 913, 924, (9th Cir. 2002)(holding "[t]he Maritime Lien Act, 46 U.S.C. § 31342, … provides a statutory basis for the existence of a district court's admiralty jurisdiction"), *cert. denied*, 538 U.S. 1000 (2003); *Farwest Steel Corp. v. Barge Sea Span 241*, 769 F.2d 620, 621 (9th Cir. 1985)(holding "[t]he district court had admiralty jurisdiction if it was adjudicating either a maritime lien … or a contract relating to the repair of an already constructed vessel"); *N. Pacific Steamship Co. v. Hall Bros. Marine Railway & Shipbuilding Co.*, 249 U.S. 119, 128 (1919) (holding that admiralty jurisdiction exists regardless of whether the repair of a vessel occurred while afloat, in dry dock, or hauled up on land).

**B.    Choice Of Law Analysis**

As a threshold issue, the Court must consider which jurisdiction's law to apply.[4]  Federal courts sitting in diversity must apply the choice-of-law rules of the state in which they sit.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *see also Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 343 (3d Cir. 2000).  If, however, the court's jurisdiction over the matter is grounded in admiralty and there is no choice-of-law clause at issue, as is the present case, then the court considers certain factors under the well-

---

[4] The issue of choice-of-law was first raised in Defendants' opposition papers.  Although Defendants correctly aver that federal maritime law applies to contractual disputes relating to a vessel in navigation, this premise concerns the court's jurisdiction and not a choice-of-law analysis.  Defendants thereafter failed to identify what such an analysis should entail, instead assuming the Court would apply New York or New Jersey law based on points of contact.  Plaintiff failed to respond to this issue and has not articulated any position on choice-of-law.  Nonetheless, if the laws of New York and New Jersey present no conflicts on any of the issues involved here, as alleged by Defendants, then the Court need not resolve the choice-of-law question, as it makes no discernable difference to the relevant analysis in the case at bar. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 838 n. 20 (1985) (Stevens, J., concurring in part and dissenting in part) ("If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." (quotation marks and citation omitted)); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) (stating that a conflict-of-law analysis is unnecessary if the laws of each jurisdiction are the same, or would lead to the same result, because there is no "conflict" in the law that needs to be resolved).  For the sake of completeness, the Court finds that New Jersey law should be applied to the instant action for the reasons set forth below.

established, federal choice-of-law principles identified in
*Lauritzen v. Larsen*, 345 U.S. 571 (1953).  *Ibid.*

In actions concerning maritime contracts, courts have
considered both the traditional *lex loci contractus* test and the
more modern, *Lauritzen* factors test to determine choice of laws
when contract terms do not resolve the question.  *Loginter S.A.
Y Parque Indus. Augua Profunda S.A. Ute v. M/V NOBILITY*, 177 F.
Supp. 2d 411, 417 (D. Md. 2001).  In *Lauritzen*, the Supreme
Court identified seven factors to consider in determining what
law to apply to a maritime tort claim involving foreign and
domestic parties.  Thorough research provides no clear guidance
from the Third Circuit as to whether the *Lauritzen* factors
should be applied in contract actions, let alone a case like
this involving domestic U.S. parties purportedly from differing
states that dispute the validity and enforceability of an
alleged maritime contract and lien.  Nonetheless, the rulings
from other courts applying *Lauritzen* in maritime lien and
contract cases, as well as the Third Circuit's consideration of
*Lauritzen,* guides this Court to find the factor analysis as the
most appropriate lens to resolve the question of choice-of-law.
*See, e.g.*, *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354,
382 (1953) (holding that the *Lauritzen* Court's factor test
"w[as] intended to guide courts in the application of maritime
law generally"); *Calhoun*, 216 F.3d at 340-348 (in a tort action,

11

as was the case in *Lauritzen*, the Third Circuit held that "[f]ederal choice-of-law rules in the admiralty arena are governed by the Supreme Court's opinion in *Lauritzen*"); *Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015, 1019 (3d Cir. 1993) (holding that *Lauritzen* factor test is the appropriate choice-of-law analysis provided that no other statutes are implicated that might otherwise preempt it); *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1124 (9th Cir.) (applying *Lauritzen* and even adding factors in a choice-of-law analysis concerning maritime liens under FMLA), *cert. denied*, 555 U.S. 1062 (2008); *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 514 (4th Cir. 2015) (noting that, in a case concerning a maritime lien under the FMLA, the Court would have applied a *Lauritzen* choice-of-law analysis, but this was unnecessary as choice-of-law was already resolved by the facts of the case).

The *Lauritzen* seven factors are: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured; (4) the allegiance or domicile of the defendant shipowner; (5) the place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum. *Lauritzen*, 345 U.S. at 582-92. Many of these factors (e.g. law of the flag and the inaccessibility of a foreign forum), however, do not apply to the present contract dispute,

which concerns entirely domestic interests.  The Court will
consider the record[5] and discuss each relevant factor in turn:

> 1.   <u>The place of the wrongful act</u>: Unlike the tort
> case of *Lauritzen*, this breach of contract action does
> not present a single location concerning the contract.
> *See Trans-tec Asia*, 518 F.3d at 1124-25 (the Ninth
> Circuit finding that courts should consider the
> Restatement (Second) of Conflict of Laws § 188 (1971)
> and look to "the place of negotiation of the contract,
> the place of performance of the contract, [and] the
> place of business of the parties").  The parties do
> not identify where the contract was made.  Likewise,
> while Defendants allege that most of the electrical
> work was performed in New York, it is unclear where
> all of the work was done.  The only clear fact is that

---

[5] As previously noted, Atlantic Power is a Pennsylvania
corporation with its principal place of business in New Jersey.
Safer Tug is a Delaware limited liability company, owned and
operated by Safer (ostensibly the sole member as no other
entities or individuals are disclosed in Safer Tug's corporate
disclosure statement), and it maintains its principal place of
business in New Jersey.  *Most* of the work on the vessel occurred
in New York; however, the record does not reflect where all the
work occurred.  Although Defendants claim "the contract was
allegedly signed in New York," they provide no support to
substantiate this supposition.  Def. Br. At 8.  The alleged
contract is merely a series of text messages between Safer and
Galka, and neither party has indicated where they were
physically located at the time of sending their respective
messages.  Further missing in the record is the citizenship of
Galka and Safer, which could also inform the Court's analysis.

the parties' principal places of business are in New
Jersey.  Therefore, this factor weighs in favor of
applying New Jersey law.

2.   The allegiance or domicile of the injured and the
vessel's owner:  Although Safer Tug is a Delaware
limited liability company and Atlantic Power is a
Pennsylvania corporation, the Court finds that this
factor supports applying New Jersey law because,
again, both parties' principal places of business are
in New Jersey.

3.   The ship owner's base of operations: In addition to
domicile and allegiance, this Court has also considered
the ship owner's base of operations a factor in applying
*Lauritzen*'s choice-of-law analysis.  *Induron Corp. v.
M/V AIGIANIS*, 1989 WL 225023, at **5-6 (D.N.J. 1989)
(applying the *Lauritzen* factors in a maritime lien case
for negligence).  Therefore, because Safer Tug's base of
operations is in New Jersey, this factor supports
applying New Jersey law.

4.   The place of contract: As noted above, the
parties have yet to present this information,
therefore the Court cannot assess this factor.

5.   <u>The law of the forum</u>: The vessel was arrested in New Jersey, therefore the Court finds this factor weighs in favor of applying New Jersey law.

In sum, the factors point to New Jersey law as controlling. The parties' principal places of business are in New Jersey and the vessel was arrested in New Jersey; therefore New Jersey has the most significant relationship to the case and a more dominant interest to New York in having its law applied.

**C.   Motion For Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (*citing* Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* "In considering a motion for summary judgment, a district court may not make credibility

15

determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (*citing Anderson*, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); *see Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." (*citing Celotex*, 477 U.S. at 325)).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts

showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.  A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s].'" *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).  For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Cooper v. Sniezek*, 418 F. App'x 56, 58 (3d Cir. 2011) (*citing Celotex*, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  *Anderson*, 477 U.S. at 257.

### D.   Plaintiff's *In Personam* Claim

Plaintiff argues it is entitled to summary judgment on its primary claim of breach of contract.[6]  To establish a breach of contract, the parties agree, and this Court has held, that Plaintiff must prove: "(1) the existence of a contract between the plaintiff and the defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the

---

[6] Plaintiff's breach of contract claim is not the only *in personam* claim asserted in the Complaint, as Plaintiff also asserts claims for quantum meruit and unjust enrichment.  These two claims are omitted from the instant motion; therefore, the Court will not address them.

contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Maersk Line v. TJM Int'l L.L.C.*, 427 F. Supp. 3d 528, 534 (D.N.J. 2019) (quoting *OOCL (USA) Inc. v. Transco Shipping Corp.*, 2015 WL 9460565, at *4 (S.D.N.Y. Dec. 23, 2015); and *citing Globe Motor Co. v. Igdalev*, 225 N.J. 469 (2016) (noting that the Supreme Court of New Jersey holds that a breach of contract claim requires the same elements as outlined in *OOCL (USA) Inc.*)).

Plaintiff claims the parties entered into a valid and enforceable contract for electrical work by virtue of the text message exchange between Galka and Safer, who Plaintiff claims were acting on behalf of their respective businesses as principals with the authority to bind the businesses. After completing its work, Plaintiff claims it presented Safer, who was acting on behalf of Safer Tug, with the Tugboat Invoice Summary. Plaintiff further avers that Safer's signature affixed to the Tugboat Invoice Summary demonstrates that Safer Tug "received and accepted" the the work as completed and agreed to pay all associated charges. Given Defendants' refusal to pay the Tugboat Invoice Summary, Plaintiff argues Defendants breached the contract. Plaintiff thus concludes the record demonstrates no genuine issues of material fact to preclude the Court from granting summary judgement in its favor.

In contrast, Defendants aver summary judgment must be denied, arguing disputes of fact exist as to every one of Plaintiff's positions.  The Court agrees.

Fundamentally, Plaintiff has not carried its burden in establishing that the text messages constitute a contract between the parties.[7]  Safer denies the authenticity of the messages, claiming he has no record nor any recollection of the messages.  The messages' content, which lacks a clear date, are irreconcilable with Safer's sworn declaration that he did not own a van, has never smoked, and knows no one by the names Darrin and Donna.  Moreover, without diving to deeply in the messages' content, or lack thereof, nowhere do the terms and conditions even reference the agreement as between the parties.

Defendants present two declarations further undermining Plaintiff's position that the parties entered into a contract: (1) Safer and Galka were old friends who occasionally exchanged services; (2) while the two never billed for their work, it was their custom to reimbursed one another for expenses; and (3)

---

[7] The Court is likewise unpersuaded by Plaintiff's emphasis that the Tugboat Invoice Summary supports the existence of a contract.  As noted above, Defendants argue the document is unreliable and dispute Plaintiff's version of events.  Under the terms of the contract, Plaintiff was responsible for billing Safer Tug periodically, logging hours, and having said hours agreed to by both parties, yet there is nothing in the record to support the existence of these terms and Defendants' agreement to be bound by said terms beyond the Tugboat Invoice Summary.

Safer and Galka, acting in their individual capacities and not their positions as principals to the parties, agreed to a simple exchange: Galka would work on the vessel and Safer would reimburse expenses and assist Galka in acquiring a maritime towing license.  In support of Defendants' theory of the case, the declarations state that Safer made the exact same arrangement with Szabo.

Accordingly, as defendants' averments are entitled "to be believed and all justifiable inferences are to be drawn in their favor," the record is replete with genuine issues of material fact.  *Marino*, 358 F.3d at 247.  Summary judgement must be denied as to count two — breach of contract.

### E.   Plaintiff's *In Rem* Claim

Next, Plaintiff argues the Court should grant summary judgment on count one — claim for necessaries, as there exists a valid maritime lien against the vessel and in favor of Plaintiff.

Defendants' opposition papers to the instant motion make no mention of this issue.  In fact, careful review of the docket shows that Defendants' only opposition to the existence of a maritime lien is found in Defendants' Brief in Opposition to Plaintiff's Motion for an Interlocutory Order Directing the Sale of the Big Jake [Dkt. No. 31].  Defendants' brief there, however, like their opposition brief here, provides no

20

substantive arguments for the Court to question the validity of the alleged maritime lien. Instead, as Plaintiff pointed out in its Reply Brief in Support of the Motion for Sale [Dkt. No. 32], Defendants' lone basis opposing the sale motion as premature is "because there has been no showing that Plaintiff holds a *bona fide* maritime lien in this matter."

The Court notes that Defendants had every opportunity, since the day they filed their opposition to sale brief (November 2, 2020) to the present, to inform the Court why such a maritime lien may be invalid. They did not, thus the Court accepts Plaintiff's position that there is no genuine issue of material fact regarding the existence of a maritime lien.[8]

The language of CIMLA is clear and unambiguous:

> (a)   Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of

---

[8] Defendants may claim their analysis of maritime contract law encompasses their position for maritime liens. However, there is no mention of the word "lien" after their brief's first page, let alone any discussion disputing the lien's existence. In addition, Defendants may claim that because the issue of the underlying contract is unclear and the Court is denying summary judgment on that count, the same facts and analysis should be applied by the Court to dispute the lien claim. This argument, however, would be fatally flawed. Maritime liens arise by operation of law; they do not spring from parties' understanding or expectations. *Rainbow Lines v. M/V TEQUILA*, 480 F.2d 1024, 1026 (2d Cir. 1973). Consequently, an enforceable maritime contract is not required to establish a necessaries lien. *Ventura Packers, Inc. v. F/V JEANINE KATHLEEN*, 305 F.3d 913, 917-19 (9th Cir. 2002). If Defendants wished to oppose the validity of the lien, they should have presented an argument.

the owner or person authorized by the
owner—

(1)  has a maritime lien on the vessel;

(2)  may bring a civil action in rem to
     enforce the lien; and

(3)  is not required to allege or prove
     in the action that credit was
     given to the vessel.

46 U.S.C. § 31342(a).

It is undisputed that the electrical services of repairs, installation of equipment, and provision of electronic supplies to the vessel are "necessaries." Necessaries are defined as "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). The list is not exhaustive, and the term necessaries is generally broadly interpreted to include anything that facilitates or enables a vessel to function. *See Equilease Corp. v. M/V Sampson*, 793 F.3d 598, 603 (5th Cir. 1986). By Safer's own account, the electrical services and work were needed to make the vessel seaworthy. Thus, the Court finds the electrical work and services are necessaries provided to a vessel within the meaning of the CIMLA.

Those "presumed to have authority to procure necessaries for a vessel" include the owner, the master, an officer or agent appointed by the owner or charterer, and a person entrusted with the management of the vessel at the port of supply. *See* 46 U.S.C. § 31341(a). Atlantic Power asserts that Safer, as the

owner and principal of Safer Tug, which in turn owned the vessel, requested necessaries for the vessel.  Safer admits he requested Galka's help in repairing the vessel.  Therefore, the record, as presented by Plaintiff, appears to show that necessaries were provided to the vessel at the direction of the vessel's owner.  Atlantic Power established a maritime lien against the vessel in the amount of $130,901.34[9]

In accordance with the statute, a maritime lien arose in favor of Plaintiff because Galka provided necessaries to the vessel on the order of Safer, the principal of Safer Tug — the vessel's owner.

### F.   Plaintiff's Request For Sanctions

Plaintiff's Reply Brief in Further Support of Its Motion For Summary Judgment [Dkt. No. 58] ("Reply/Sanctions Brief"), is less a reply and more a motion for sanctions.  Plaintiff claims it is the victim of trial by ambush, as Defendants' failure to disclose their theory of the case has prejudiced Plaintiff's "trial strategy into falsely creating a belief that there were

---

[9] Since Atlantic Power has shown that it provided necessaries to the Big Jake, it has demonstrated the right to a maritime lien against the boat, under 46 U.S.C. § 31342.  Although interest and attorney's fees are sometimes awarded in maritime cases, (see *Adriatic Ship Supply Co., Inc. v. M/V Shaula*, 632 F. Supp. 1573 (E.D. Pa. 1986) and *Ocean Barge Transp. Co. v. Hess Oil Virgin Islands Corp.*, 598 F. Supp. 45, 48 (D. Vi. 1984), *aff'd mem.*, 760 F.2d 257 (3d Cir. 1985)), the Court will not award them here since there has not been a finding of bad faith against the Defendants.

in fact no substantive affirmative defenses in this matter and
no reason to go through the expenses of expansive discovery as
nothing indicating an affirmative defense existed." 
Reply/Sanctions Brief at 7.  In short, Plaintiff requests the
Court strike Defendants' theory of the case and award attorneys'
fees against Defendants.

Based on the record and Plaintiff's Reply/Sanctions Brief,
it appears that Defendants' theory of the case was withheld from
Plaintiff (and the Court) until Defendants filed their
opposition to the instant motion for summary judgment, thus
Plaintiff specifically requests that the Court:

> 1.   Rule that Defendants waived their ability to
> present an accord and satisfaction defense as it was
> never affirmatively pled; and
>
> 2.   Preclude Defendants from arguing or presenting
> anything (including in the instant motion for summary
> judgment) that suggests Safer and Galka bartered for
> services (Galka's electrical contracting services in
> exchange for reimbursement of expenses and the
> opportunity to obtain a maritime towing license); and
>
> 3.   Strike both the Safer and Szabo declarations,
> first because the facts underlying Defendants'
> position was never disclosed in discovery, and second

because Szabo was never identified as a witness with

knowledge of any relevant information; and

4.    Award Plaintiff attorneys' fees as a sanction for

Defendants' alleged discovery abuses.

Despite Plaintiff's contentions of Defendants' misconduct,

the Court will not sanction Defendants at this time because,

paradoxically, a reply brief is not the proper vehicle to

present Plaintiff's sanctions argument.[10]  "The law is clear that

reply briefs should respond to arguments raised in the

opposition brief, or explain a position in the initial brief

that the respondent refuted ... Reply briefs are not the time to

present new argument."  *Smithkline Beecham PLC v. Teva Pharm.*

*USA, Inc.*, 2007 WL 1827208, at *1 (D.N.J. June 22, 2007).

"Because the local rules do not permit sur-reply briefs, the

non-moving party cannot respond to newly minted arguments

contained in reply briefs."  *Dana Transp., Inc. v. Ableco*

*Finance, LLC*, 2005 WL 2000152, at *6 (D.N.J. Aug. 17, 2005).  As

Defendants have yet to respond to Plaintiff's request for

sanctions, the record needs to be more fully developed for the

---

[10] The instant motion is a motion for summary judgment, not a
motion for sanctions.  Local Civil Rule 7.1 dictates the
procedure for motion practice that litigants must follow.  If
Plaintiff sought to strike Defendants' theory of the case from
being presented in opposition to summary judgment, then
Plaintiff should have filed a motion to strike while the instant
motion was pending.

Court to impose sanctions.  Therefore, the Court will grant

Plaintiff leave to file a motion for sanctions if it so chooses.

**CONCLUSION**

Based on the foregoing analysis, Plaintiff's Motion for

Summary Judgment will be granted in part and denied in part.

An appropriate Order will be entered.


Date: February 1, 2022                s/ Noel L. Hillman
At Camden, New Jersey               NOEL L. HILLMAN, U.S.D.J.